# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

BRIAN R. WALSHE,

        Defendant.

Criminal No. 18-10399-DPW

## TRIAL BRIEF OF THE UNITED STATES

The United States respectfully submits this trial brief to provide an overview of the evidence it intends to introduce at trial and to identify relevant issues in accordance with the Court's Pretrial Order.   The trial of this matter is presently scheduled to begin on March 16, 2020.

## I.      PROCEDURAL BACKGROUND

On or about May 9, 2018, the defendant, BRIAN R. WALSHE, was arrested and charged by Criminal Complaint with wire fraud, in violation of 18 U.S.C. § 1343.   Dkt. No. 2.   On the same day, pursuant to court-authorized search warrants, the FBI executed search warrants for WALHSE's residence, two email accounts linked to WALSHE, a storage unit, and the person of WALSHE and his wife.

On October 31, 2018, a grand jury returned an Indictment charging WALSHE with wire fraud, in violation of 18 U.S.C. § 1343 (Count One); interstate transportation for a scheme to defraud, in violation of 18 U.S.C. § 2314 (Count Two); possession of converted goods, in violation of 18 U.S.C. § 2315 (Count Three); and unlawful monetary transaction, in violation of 18 U.S.C. § 1957 (Count Four).   Dkt. No. 23.

## II.        GOVERNMENT'S THEORY OF THE CASE

This case emanates from BRIAN R. WASLHE's conversion and fraudulent sale of two paintings known as the "*Shadows*," which were painted by renowned artist and cultural icon Andy Warhol.

WALSHE's scheme had two main components: first, WALSHE obtained and converted certain artwork (including the two *Shadows*) from Victim 2, with the intention to return neither the artwork nor the proceeds of their sale.   Second, WALSHE fraudulently sold the *Shadows* (or copies of the *Shadows*) to Victim 1, by falsely representing, among other things, that WALSHE was the true owner of the paintings and that the paintings bore authentication stamps from the Warhol Foundation.

Although the government will offer evidence to show that the paintings that WALSHE sold to Victim 1 were in fact fake/forged—and were not the original *Shadows* that WALSHE had obtained from Victim 2—the government need not prove that the paintings WALSHE sold were fake in order to convict WALSHE of wire fraud.   It is sufficient to show that WALSHE falsely represented that he owned the *Shadows* and that they bore the Warhol Foundation stamps (which the sold paintings did not).   The false representations made by WALSHE alone made the transaction fraudulent—but for those false representations, Victim 1 would not have contracted to buy the paintings.

Similarly, regardless of whether WALSHE sold the original *Shadows* to Victim 1 or sold him forgeries, WALSHE is guilty of the conversion charge as to Victim 2.   WALSHE did not return to Victim 2 either the paintings he originally took or the proceeds of the sales of any such paintings.

In short, WALSHE fraudulently sold the paintings to Victim 1 [Count 1: wire fraud]; caused Victim 1's agent to travel interstate to pick up the paintings as part of the fraud [Count 2: interstate transportation for scheme to defraud]; possessed converted goods by returning neither the paintings nor the proceeds to Victim 2 [Count 3: conversion]; and deposited proceeds of the fraud into his own account [Count 4: unlawful monetary transaction].

### III.    FACTUAL BACKGROUND[1]

In 2011, the defendant, Brian R. WALSHE, visited a friend ("Victim 2") and his family in South Korea.   WALSHE told Victim 2 that WALSHE could sell some of the art belonging to Victim 2 and Victim 2's family on their behalf.[2]   Victim 2 trusted WALSHE with two Andy Warhol "*Shadows*" paintings (the "*Shadows*"),[3] an Andy Warhol "*Dollar Sign*" painting (the "*Dollar Sign*"), and additional artworks (two prints by artist Keith Haring and a Chinese statuette). Victim 2's family had purchased the *Shadows* from a dealer in Germany for $240,000, and the *Shadows* had been certified by the Andy Warhol Authentication Board, Inc., with the Warhol Foundation numbers PA65.049 and PA65.032 stamped on the back.[4]   To help WALSHE sell the artwork, Victim 2 gave WALSHE documents showing the provenance of the artwork, including documents showing the provenance and history of the *Shadows*.

At some point, WALSHE formed the intention neither to return the *Shadows* to Victim 2

---

[1]    The facts of the case are set forth more fully in the Affidavit of Special Agent Kristin Koch submitted in support of the Applications for a Criminal Complaint and Search Warrants, dated May 8, 2018.   *See* Dkt. No. 2.   However, at that time, the FBI was not aware of Victims 3 and 4, who were therefore not discussed in the Complaint, but who are discussed below.

[2]    Victim 2 is expected to testify at trial.

[3]    In 1978-1979, Warhol painted numerous abstract paintings of various sizes known as the "*Shadows*."   This case involves two *Shadows* that are 11x14 inches in size.

[4]    The "Andy Warhol Foundation for the Visual Arts" or "Warhol Foundation" certified authentic works of art by Andy Warhol and gave such items unique identifying numbers. The government will introduce evidence that Warhol Foundation certifications are considered very

nor to remit to Victim 2 the proceeds of their sale.[5]   In 2011, WALSHE attempted to sell the *Shadows* and the *Dollar Sign*.   First, WALSHE brought the *Shadows* to the Gagosian Gallery in New York.[6]   However, the Gallery declined to accept the *Shadows* from WALSHE because it had doubts about WALSHE.   Also in 2011, WALSHE consigned the *Shadows* and the *Dollar Sign* to Christie's Auction House in New York.[7]   Through Christie's, WALSHE sold the *Dollar Sign* for $40,000 but withdrew the *Shadows* after Christie's required him to reframe them.   WALSHE did not inform Victim 2 of the sale of the *Dollar Sign* or attempted sale of the *Shadows*, nor did he pass any proceeds to Victim 2.

In 2012, Victim 2 tried to get back his family's artwork, but WALSHE rebuffed Victim 2's attempts to reach him through telephone or email.   Later, in February 2014, a mutual friend attempted to intervene on Victim 2's behalf, but WALSHE put off this friend's attempts to regain the artwork.[8]   This mutual friend sent another friend who lived in Boston to WALSHE's home on Beacon Hill; WALSHE returned to that person the other artwork (the two Haring prints and a Chinese statuette) but not the *Shadows* or *Dollar Sign*.   Later, WALSHE told the mutual friend that he (WALSHE) still had the *Shadows* or the *Dollar Sign* but did not respond to the friend's request to return them.   To this day, WALSHE has not returned the *Shadows* or the *Dollar Sign* to Victim 2.

In or about October 2014, WALSHE paid an individual to make copies of the *Shadows*.

---

reliable and meaningful in the art industry.

[5]   This allegation forms the basis of the conversion charge (Count Two).

[6]   An employee of the Gagosian Gallery who met with WALSHE is expected to testify at trial.

[7]   An employee of Christie's who dealt with WALSHE is expected to testify at trial.

[8]   This friend is expected to testify at trial.

In September 2015, WALSHE entered into a contract to sell the *Shadows* to Victim 3, an art consultant in Paris, France, for $145,000.   WALSHE promised to sell two authentic *Shadows*, identified by their Warhol Foundation numbers, and provided the documents obtained from Victim 2 for provenance.

Starting in or about October 2015, WALSHE persuaded Victim 4,[9] who had been WALSHE's dentist, to give WALSHE $23,000 for artwork that WALSHE claimed was the *Dollar Sign*.[10]   Although captioned a "sale," WALSHE told Victim 4 that he was planning to sell the Dollar Sign to another buyer and that they would share the profit.   WALSHE showed Victim 4 the documents obtained from Victim 2 as provenance for the "sale."   Victim 4 gave WALSHE a check for $23,000, which WALSHE deposited into a newly-opened bank account on November 2, 2015.

From November 2 to 7, 2015, WALSHE traveled to France.[11]   In France, WALSHE met with Victim 3, identified himself by his passport, and delivered the *Shadows* that WALSHE had previously contracted to sell to Victim 3.   In return, Victim 3 had the payment for the *Shadows* wired to a bank account controlled by WALSHE.

---

[9]   Victim 4 is expected to testify at trial.

[10]   It is likely that the *Dollar Sign* that WALSHE "sold" Victim 4 was a fake, given that WALSHE had already sold the *Dollar Sign* (or some artwork he claimed was the *Dollar Sign*) years ago via an auction at Christie's.   Walshe did not tell Victim 4 that he had already sold (either a fake or a real version of) the *Dollar Sign* via Christie's.   In either event, what matters for present purposes is not which version of the *Dollar Sign* was fraudulently sold by WALSHE and which version was real.   What is relevant about this *Dollar Sign* transaction with Victim 4 is that it shows WALSHE engaging in multiple attempted sales of the same artwork (at least one of which must necessarily be fraudulent), which goes to issues such as WALSHE's knowledge, intent, modus operandi, absence of mistake, lack of accident, etc. vis-à-vis his dealings with Victim 1 and the *Shadows*.   This evidence is also relevant because it further connects WALSHE to artwork (*Dollar Sign* and *Shadows*) taken from Victim 2.

[11]   Border crossing documents confirm that WALSHE was in France.

At some point after November 2015, WALSHE offered to sell the *Shadows* to Victim 4, who declined.   Victim 4 repeatedly asked WALSHE if WALSHE could sell the *Dollar Sign* that Victim 4 was holding onto, but WALSHE said that he did not have a buyer yet.

In November 2016, WALSHE attempted to sell the *Shadows* again, this time by listing them on eBay for $100,000.   WALSHE falsely claimed in the listing and in subsequent communications with the buyer that he owned the *Shadows* and the *Shadows* he would convey would have the Warhol Foundation stamps.   The listing stated as follows:

> We are selling 2 Andy Warhol paintings from our private collection. We are parting with these pieces only because we need the money for renovations to our house. Our loss is your gain. Pieces bought from a former Martin Lawrence art dealer in California. We overpaid terribly in 2007 for the art. Price paid $240,000. We have enclosed the Christie's estimates as of 2011 for the art as well. Auction range $120,000 to $180,000. We are trying to sell on Ebay because it is much cheaper and because Christie's won't be able to auction our pieces till May 2017. The pieces are numbered and registered with the Warhol Foundation. Pieces are from 1979. Size 14 inches by 11 inches. Synthetic Polymer Paint and Silkscreen ink on canvas. Warhol Foundation # PA65.049 & PA65.032.

Victim 1, who is an art dealer in California specializing in Warhol, contacted WALHSE about the *Shadows*.[12]   On or about November 3, 2016, WALSHE and Victim 1 spoke by telephone, as well as by email and text message.[13]   WALSHE and Victim 1 agreed that Victim 1 would pay $80,000 in cash for the *Shadows*; at WALSHE's request, they further agreed that they would not use PayPal, eBay's escrow service.   WALSHE and Victim 1 subsequently executed a contract on DocuSign, an internet service, which included a three-day right of rescission.   WALSHE and Victim 1 also agreed that Victim 1's assistant, Witness 1, would travel to Boston to pick up the *Shadows* in person.[14]   Throughout the transaction and in the contract, WALSHE represented that he would

---

[12]   Victim 1 is expected to testify at trial.

[13]   These telephone calls are the wire communications alleged in Count One.

[14]   This travel is the interstate transportation alleged in Count Two.

sell *Shadows* bearing the Warhol Foundation authentication stamps, and that he owned the *Shadows* himself.

On November 7, 2016, Witness 1 traveled from California to Boston, Massachusetts to pick up the *Shadows* that WALSHE had advertised and contracted for sale.[15]  Witness 1 met WALSHE at the Four Seasons Hotel in Boston,[16] where she gave WALSHE a certified check for $80,000 and received the paintings from WALSHE.   In contrast to the pictures of the *Shadows* included in the eBay listing, which showed on the back of the paintings stickers from the German gallery with Warhol Foundation numbers, WALSHE had placed the fake/forged paintings in frames that were screwed shut and obscured the back where the stamps would have been.   With her cell phone, Witness 1 took photographs of the front of the forged paintings at the Four Seasons, which she sent to Victim 1.   Victim 1 told her to take the paintings, which she brought back to the gallery in California.

That same day, November 7, 2016, WALSHE deposited the cashier's check for $80,000 into his account.[17]   WALSHE quickly spent much of that money, with a large part of it going to pay credit card debt.[18]

The next day, November 8, 2016, Victim 1 went to the gallery and examined the paintings. Almost immediately, he suspected the paintings of being fakes.   Once he removed the frames, he confirmed that they lacked the Warhol Foundation stamps marking them as authentic.

Victim 1 attempted to reach WALSHE by phone call, text message, and email without

---

[15]   Witness 1 is expected to testify at trial.

[16]   The government expects to introduce security video from the Four Seasons, which shows WALSHE arriving at the Four Seasons with a package and leaving without the package.

[17]   This deposit was the unlawful monetary transaction alleged in Count Four.

[18]   As discussed below, the government will introduce records of WALSHE's bank accounts.

success, and even attempted to reach WALSHE through his wife and mother.   Eventually, WALSHE made contact with Victim 1 and agreed to refund Victim 1's purchase price in return for the fake paintings.   However, WALSHE continued to put off Victim 1, claiming falsely that he (WALSHE) was waiting for an incoming wire or having trouble with the bank.   In fact, according to records of WALSHE's bank accounts, there were no incoming wires and what was left of Victim 1's $80,000 sale price was still in his account.   In the end, WALSHE sent two wires, returning $30,000 of the purchase price but no more, and then cut off contact with Victim 1. Victim 1 informed law enforcement.

### IV.     PROPOSED STIPULATIONS OF FACT

The parties are continuing to discuss any stipulations of fact.   If the defendant agrees to any stipulations, the government will advise the Court.

### V.     ANTICIPATED EVIDENTIARY ISSUES

#### A.     <u>Call Records, Bank Records, and Other Voluminous Evidence</u>.

The government intends to offer summary exhibits of voluminous records, such as telephone call records and bank records, pursuant to Fed. R. Evid. 1006.   In the case of telephone call records, for example, such exhibits will summarize hundreds of pages of call records and will detail the history of calls between WALSHE and Victim 1.   Similarly, in the case of bank records, such exhibits will summarize transactions between and among several related bank accounts. These summaries will streamline the government's presentation and make such issues easier for the jury to understand.   The underlying evidence has already been produced to defense counsel. Summary charts and exhibits regarding this evidence will be produced to defense counsel in advance of trial.

According to Fed. R. Evid. 1006, "the contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation."  Telephone records are among the type of record that can be summarized and presented to the jury.  See United States v. Capozzi, 2005 WL 1027373 (D. Mass. 2005) (defendant conceded that the call records were voluminous).

In United States v. Milkiewicz, 470 F.3d 390, 393 (1st Cir. 2006), the First Circuit addressed the admissibility of summary charts of thousands of pages of financial information. The First Circuit notes that while often the only evidence the jury will see is the summary of the underlying evidence, at times the summary or chart may be admitted in addition to the underlying documents to "provide the jury with easier access to the relevant information." Id. at 396-97.  See also United States v. Drougas, 748 F.2d 8, 26 (1st Cir. 1984) (holding that charts which summarized over 100 calls during the course of the drug conspiracy were properly admitted under Rule 1006).  The same logic applies here.  The summary exhibits will provide the jury easier access to information currently in hundreds of pages of documents.  Furthermore, although the records are organized chronologically, the print-outs themselves are dense and often difficult to read, containing multiple entries per page.  Accordingly, it would be a sound exercise of the Court's discretion to admit summary exhibits of the telephone records here.  See Frasor v. Major League Soccer, L.L.C., 284 F.3d 47, 67 (1st Cir. 2002) ("It is hard to imagine an issue on which a trial judge has more discretion than as to whether summary exhibits will be helpful.").

### B.    Warhol Testimony.

The government intends to call at trial, as a fact witness, a friend of Andy Warhol who worked for him for over twenty years, eventually becoming the Vice President of Andy Warhol Enterprises, and a former member of the Warhol Foundation.   This friend was present in Warhol's

studio when Warhol created the series of *Shadows* paintings in 1978 and 1979.   The friend recently inspected the paintings that WALSHE sold to Witness 1.   The friend found that the paintings sold by WALSHE to Witness 1 were not painted by Warhol.   Among other things, the friend will testify that the stretcher bar did not look correct; that Warhol at that time used a manual staple gun with different and fewer staples; that Warhol used primarily linen canvas, not cotton duct; that Warhol used glistening at the back, which the forged paintings did not have; that Warhol's paint was thicker and brighter; that Warhol and his assistants would have wrapped the paint around the back of the canvas, not the ink; and that Warhol would have raised the paint.   In addition, the friend personally authenticated Warhol's artwork in the past on behalf of the Warhol Foundation, and observed that the paintings in question did not have the Warhol Foundation stamps.   Given that his testimony about the paintings will be based on personal observations and first-hand knowledge of Andy Warhol and his works, this testimony is admissible as fact witness testimony, and not expert testimony.

## C. **Expert testimony**.

Absent stipulations, the government intends to introduce evidence regarding its extraction of data from the defendant's computer; and evidence from a professional appraiser, who will testify that the *Shadows*, if real, were worth more than $5,000 (the threshold amount for the conversion charge).

Under Fed. R. Evid. 702, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified to appear as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise" as long as the information is reliable.   Courts considering such evidence have consistently "emphasized the fact that expert testimony is admissible where

the inference that are sought to be drawn are inferences that a jury could not draw on its own" or even where "the subject looks like one the jury understands from every day life, but in fact, the inference the jury might draw are erroneous."   United States v. Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999).

### D.   Admission of Market Reports.

The government intends to offer information regarding the value of the *Shadows* from www.artnet.com as exceptions to the hearsay rule pursuant to Fed. R. Evid. 803(17).   That site is a well-known and comprehensive database of art auctions that is relied upon by professional art appraisers.   As a result, it qualifies as a market report under Rule 803(17).   For example, a publication of "properties sold, the sales prices, and the dates the sales were closed" has been previously admissible under Rule 803(17).   United States v. Cassiere, 4 F.3d 1006, 1018-1019 (1st Cir. 1993); see also United States v. Grossman, 614 F.2d 295, 297 (1st Cir. 1980) (catalog, including price information, admissible as a commercial publication under Rule 803(17)).

### E.   Authentication of Business Records.

The government hereby provides notice to defendants and the Court that it intends to authenticate business records pursuant to Fed. R. Evid. 902(11) by a written declaration of a qualified person.

### VI.   JURY VOIR DIRE QUESTIONS

At present, the government does not believe that this trial raises any unusual issues or heightened concerns warranting special voir dire questions different from the Court's typical practice.   Nonetheless, the government's proposed jury voir dire questions will be filed no later than 21 days before trial.

## VII.    PROPOSED JURY INSTRUCTIONS

The government's proposed jury instructions will be filed no later than 21 days before trial.

## VIII.   LENGTH OF TRIAL

The government will file witness and exhibit lists pursuant to the Court's Pretrial Order and has already provided a preliminary list of civilian witnesses and proposed exhibits to defense counsel.

In total, at this time, the government expects its case-in-chief to last no more than two weeks of 9:00 a.m. to 1:00 p.m. trial days.  That time may be shorter if the parties can reach agreement on the authenticity or admissibility of certain evidence.

## IX.    CASE AGENT

Special Agent Kristin Koch of the FBI was the case agent for this investigation.  The government requests permission to have her sit with counsel throughout the trial and/or to be exempt from any sequestration order that the Court may otherwise enter for trial witnesses.

## X.    SPECIAL ARRANGEMENTS

The government expects to call numerous witnesses from outside Massachusetts, including Victim 1, Witness 1, employees of the Gagosian Gallery and Christie's, and its expert witnesses. Furthermore, the government expects to call numerous witnesses from outside the country, including Victim 2, Victim 2's friend, Victim 3, and the artist who created the fake paintings. Depending on the actual progress of the trial and those witnesses' travel arrangements, the government may request that certain witnesses be allowed to testify out of order.

The government will consult with court personnel to ensure that the format of its exhibits will be compatible with the courtroom's facilities.   The government also anticipates that it may refer to certain charts or photographs (which will require the use of an easel) during its opening statement.   The government will address that with defense counsel and the Court prior to trial.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    /s/ Timothy E. Moran
          TIMOTHY E. MORAN
          KUNAL PASRICHA
          Assistant United States Attorneys

Dated: February 24, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Timothy E. Moran
TIMOTHY E. MORAN
Assistant United States Attorney

Date: February 24, 2020