UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Cr. No. 18-10399-DPW-1 |
| | ) |
| BRIAN R. WALSHE, | ) |
|     Defendant | ) |

SENTENCING MEMORANDUM OF THE UNITED STATES

Defendant Brian Walshe is scheduled to be sentenced on October 6, 2021 for his convictions for wire fraud, interstate transportation for scheme to defraud, and engaging in unlawful monetary transactions. For the reasons presented herein, in the PSR, and to be presented at the sentencing hearing, and consistent with the plea agreement, the government requests principally a sentence of 30 months' imprisonment, which is the low end of the applicable advisory Guidelines Sentencing range. The defendant's offense conduct was not based on a one-off lapse in judgment, but based on a pattern of lies, deceit, and fraud. The defendant orchestrated a multi-year, multi-faceted scheme to defraud multiple people who had an interest in paintings by iconic American artist Andy Warhol. The nature and circumstances of the offense, and the history and characteristics of the defendant, support the government's requested sentence. .

**I.  THE OFFENSES**

The government begins with a summary of the offense conduct to highlight the breadth and scope of the defendant's conduct, which spanned multiple years and involved multiple known victims (and almost assuredly involved one or more unknown victims).

*The Original Artwork*

This case of fraud began with an act of trust. In 2011, WALSHE stayed with the family of a friend ("Victim 2") in South Korea. WALSHE and Victim 2 became friends during their freshman year at Carnegie Mellon. PSR ¶ 25. WALSHE told Victim 2 that WALSHE could sell some of the art belonging to Victim 2 and Victim 2's family on their behalf. Victim 2 trusted WALSHE with two Andy Warhol "*Shadows*" paintings (the "*Shadows*"),[1] an Andy Warhol "*Dollar Sign*" painting (the "*Dollar Sign*"), and additional artworks (two prints by artist Keith Haring and a Chinese statuette). PSR ¶ 27. Victim 2's family had purchased the *Shadows* from a dealer for $240,000, and the *Shadows* had been certified by the Andy Warhol Authentication Board, Inc., with the Warhol Foundation numbers PA65.049 and PA65.032 stamped on the back.[2] PSR ¶ 26.

At some point – likely from the start – WALSHE formed the intention neither to return the *Shadows* to Victim 2 nor to remit to Victim 2 the proceeds of their sale, as demonstrated by contemporaneous excerpts from his diary:[3]

    a.    03/29/2011, "Went to Uslan, saw [Victim 2]. Had nice BBQ. Then we took all the art from Uslan and drove to Seoul. Got zero sleep. The [sic] want to sell all the art. Let's see what happens. I will make this deal work. They have stuff that is good. [Victim 2] and his family are all about themselves. Makes it easy for me to do them up. Whatever. The [sic]

---

[1] In 1978-1979, Warhol painted numerous abstract paintings of various sizes known as the "*Shadows*." This case involves two *Shadows* that are 11x14 inches in size.

[2] The "Andy Warhol Foundation for the Visual Arts" or "Warhol Foundation" certified authentic works of art by Andy Warhol and gave such items unique identifying numbers. Warhol Foundation certifications are considered very reliable and meaningful in the art industry.

[3] As part of its investigation in this case, the government obtained a copy of the defendant's computer and a handwritten calendar, which contained diary entries and provided valuable insight into the defendant's mindset, intent, and background. For example, as shown in these summaries, *as far back as in 2011*, the defendant had started to form the intent to betray the people who trusted him (*i.e.*, some of the victims in this case), referring to it being "easy for me to do them up" and "need to get off with some of the good pieces" of art.

can eat it!"

  b. 3/31/2011, "I have a plan for the art…. Need to get off with some of the good pieces…. Hope I can make it through. This one is going to be bumpy."

  c. "Spoke with [Friend 1] and KI [unidentified]. IF they know something they aren't showing it."

  d. 04/05/2011, "Being in Korea is making me crazy. I could have done something fun. If I don't make $ or this deal I will be pissed. Need to sell the Shadows. I will take all the $ then only a taste of everything else. Let [Victim 2] deal with the rest of it."

  e. 04/26/2011, "Lots to do with all the art in the next couple of day. Need to leave town tonight. [In NYC] Went to Christie's, not the best news, but o.k."

  f. 01/30/2012, "Didn't see [Victim 2] or pick up the art. Need him to send it. Stole his Ap watch.[4] Don't why I am so upset with [Victim 2]. He is a disaster."

PSR ¶ 28.

Regardless of when the defendant formed the intention to sell the Paintings for his own benefit, he did so repeatedly, sometimes successfully, and – when successful – very profitably. The FBI has learned of at least some of these attempts, the first one going back a decade.

Beginning in 2011 (the same year that he acquired the paintings), WALSHE attempted to sell the *Shadows* and the *Dollar Sign*. First, WALSHE brought the *Shadows* to the Gagosian Gallery in New York. However, the Gallery declined to accept the *Shadows* from WALSHE because it had doubts about WALSHE. Nevertheless, he misused or modified a document that Gagosian Gallery provided to him, which he later used as provenance for his fraudulent sales.[5] PSR ¶ 29.

---

[4] The "Ap watch" was probably an Audemars Piguet, a high-end Swiss watch. However, when asked, Victim 2 did not recall having or losing an Audemars Piguet watch.

[5] The FBI also found blank Christie's stationary in its search of WALSHE's storage location (along with other copies of Warhol art which the FBI attempted to identify).

3

Also in 2011, WALSHE consigned the *Shadows* and the *Dollar Sign* to Christie's Auction House in New York. Through Christie's, WALSHE sold the *Dollar Sign* for $40,000 but withdrew the *Shadows* after Christie's required him to reframe them. After the withdrawal, WALSHE netted only about $10,000. PSR ¶ 32. WALSHE requested authentication paperwork for the Haring piece but Christie's refused. Later, WALSHE attempted to sell the Haring through Christie's. PSR ¶¶ 32-33.

WALSHE did not inform Victim 2 of the sale of the *Dollar Sign* or attempted sale of the *Shadows*, nor did he pass any proceeds to Victim 2. Again, his diary entries show his true intent:

    a.    02/04/2012, "Put the watch on eBay. On Monday I will go to the store to see if I can get $16,000 for the watch on Monday. IT $22,000 watch at least."

    b.    02/09/2012, "Sold watch for $12k if the deal doesn't go through, I will have to take $8,000. Need to contact [Victim 2] about art ASAP. Need to prepare [on art further?] by the 14th."

    c.    06/28/2012, "Tough day. [Victim 2] wanted his art back."

    d.    07/09/2012, "I have spent a fortune. In major trouble. Need to sell the Haring. What is taking the bitch so long?"

PSR ¶ 32.

In 2012, Victim 2 tried to get back his family's artwork, but WALSHE rebuffed Victim 2's attempts to reach him through telephone or email. Later, in February 2014, a mutual friend attempted to intervene on Victim 2's behalf, but WALSHE – repeatedly – put off this friend's attempts to regain the artwork. PSR ¶¶ 33, 35. This mutual friend sent another friend who lived in Boston to WALSHE's home on Beacon Hill; WALSHE returned to that person the other artwork (the two Haring prints and a Chinese statuette) but not the *Shadows* or *Dollar Sign*. PSR ¶ 34. Later, WALSHE told the mutual friend that he (WALSHE) still had the *Shadows* or the *Dollar Sign* but did not respond to the friend's appeal to friendship to return them: "I guess

4

you're busy.. But I am beginning to wonder what [Victim 2] really meant to you. I don't see any good reason why you have set aside finding out what he's going through. What's more important than this?". PSR ¶ 35.

*To this day*, WALSHE has not returned the *Shadows* or the *Dollar Sign* to Victim 2.

*Fraudulent Copies and Fraudulent Sales*

In 2011, WALSHE had a set of fake *Shadows* Paintings created by a Forger 1, an artist in New York who specialized, at the time, in replicas; in fact, he signed each piece. PSR ¶ 36. The FBI recovered that set of fake paintings from Victim 3. Thus, the FBI discovered post-indictment that the fraud was broader than initially thought, although the full scope of the fraud undertaken by WALSHE might never be discovered.

In September 2015, WALSHE entered into a contract to sell the *Shadows* to Victim 3, an art consultant in Paris, France, for $145,000. WALSHE promised to sell two authentic *Shadows*, identified by their Warhol Foundation numbers, and provided the documents obtained from Victim 2 for provenance. PSR ¶ 43.

Starting in or about October 2015, WALSHE persuaded Victim 4, who had been WALSHE's dentist, to give WALSHE $23,000 for artwork that WALSHE claimed was the *Dollar Sign*.[6] Although captioned a "sale," WALSHE told Victim 4 that he was planning to sell the Dollar Sign to another buyer and that they would share the profit. WALSHE showed Victim 4 the documents obtained from Victim 2 as provenance for the "sale." Victim 4 gave WALSHE

---

[6] It is likely that the *Dollar Sign* that WALSHE "sold" Victim 4 was a fake, given that WALSHE had already sold the *Dollar Sign* (or some artwork he claimed was the *Dollar Sign*) years ago via an auction at Christie's. WALSHE did not tell Victim 4 that he had already sold (either a fake or a real version of) the *Dollar Sign* via Christie's.

5

a check for $23,000, which WALSHE deposited into a newly-opened bank account on November 2, 2015.  PSR ¶ 44.

From November 3 to 7, 2015, WALSHE traveled to France.  In France, WALSHE met with Victim 3, identified himself by his passport, and delivered the *Shadows* that WALSHE had previously contracted to sell to Victim 3.  In return, Victim 3 had the payment for the *Shadows* wired to a bank account controlled by WALSHE.  PSR ¶ 45.

At some point after November 2015, WALSHE offered to sell the *Shadows* to Victim 4, who declined.  Victim 4 repeatedly asked WALSHE if WALSHE could sell the *Dollar Sign* that Victim 4 was holding onto, but WALSHE said that he did not have a buyer yet.  PSR ¶ 46.[7]

In or about February 2016, WALSHE paid Forger 2 to make another set of fake *Shadows*, again claiming that it was for insurance purposes.  WALSHE did not show her the original *Shadows*, perhaps because they had already been sold; instead, he gave her photographs.  It took her a month to produce a set of copies—the paintings that WALSHE sold to Victim 1.  PSR ¶ 39.

*Fraudulent Sale to Victim 1*

In November 2016, WALSHE attempted to sell the *Shadows* again, this time by listing them on eBay for $100,000 and claiming that they were from his "private collection".  PSR ¶ 8. WALSHE included photographs of the paintings and documents obtained from Victim 2 as provenance, as well the Warhol Foundation numbers.  PSR ¶¶ 8-9.  Victim 1, who is an art dealer in California specializing in Warhol, contacted WALSHE about the *Shadows*.  On or about November 3, 2016, WALSHE and Victim 1 spoke by telephone, as well as by email and text message.  PSR ¶ 10.  WALSHE and Victim 1 agreed that Victim 1 would pay $80,000 in

---

[7] In May 2018, after WALSHE was arrested, Victim 4 heard of the arrest, feared that he had been defrauded, and contacted WALSHE.  WALSHE gave him a check for $23,000, drawn on his mother's account.  PSR ¶ 46.

cash for the *Shadows*; at WALSHE's request, they further agreed that they would not use PayPal, eBay's escrow service. WALSHE and Victim 1 subsequently executed a contract on DocuSign, an internet service, which included a three-day right of rescission. PSR ¶ 11. After reaching that agreement, WALSHE asked Victim 1 if he was interested in purchasing three more Warhol abstract paintings. Victim 1 declined. PSR ¶ 13.

On November 7, 2016, Victim 1's assistant, Witness 1, traveled from California to Boston, Massachusetts to pick up what they thought were the real *Shadows*. Witness 1 met WALSHE at the Four Seasons Hotel in Boston, where she gave WALSHE a certified check for $80,000 and received the paintings from WALSHE. In contrast to the pictures of the *Shadows* included in the eBay listing, which showed on the back of the paintings stickers from the German gallery with Warhol Foundation numbers, WALSHE had placed the fake/forged paintings in frames that were screwed shut and obscured the back where the stamps would have been. With her cell phone, Witness 1 took photographs of the front of the forged paintings at the Four Seasons, which she sent to Victim 1. Victim 1 told her to take the paintings, which she brought back to the gallery in California. PSR ¶¶ 14-17.

That same day, November 7, 2016, WALSHE deposited the cashier's check for $80,000 into his account. WALSHE quickly spent much of that money, with a large part of it going to pay credit card debt, as well as cash withdrawals of $8,000. PSR ¶ 17.

The next day, November 8, 2016, Victim 1 went to the gallery and examined the paintings. Almost immediately, he suspected the paintings of being fakes. Once he removed the frames, he confirmed that they lacked the Warhol Foundation stamps marking them as authentic. PSR ¶ 18.

Victim 1 attempted to reach WALSHE by phone call, text message, and email without success, and even attempted to reach WALSHE through his wife and mother. Eventually, WALSHE made contact with Victim 1 and agreed to refund Victim 1's purchase price in return for the fake paintings. However, WALSHE continued to put off Victim 1, claiming falsely that he (WALSHE) was waiting for an incoming wire or having trouble with the bank. In fact, according to records of WALSHE's bank accounts, there were no incoming wires and what was left of Victim 1's $80,000 sale price was still in his account. In the end, WALSHE sent two wires, returning $30,000 of the purchase price but no more, and then cut off contact with Victim 1. Victim 1 informed law enforcement. PSR ¶¶ 19-23.

## II. GUIDELINES ANALYSIS AND CRIMINAL HISTORY

### A. Loss Amount

The guidelines in this case are driven primarily by loss amount, which Probation in PSR ¶ 54 and the parties calculated as follows:[8]

- Victim 1: $80,000 for the amount paid for fraudulent *Shadows* Paintings, although the defendant returned $30,000;

- Victim 2: $240,000 for the *Shadows* Paintings and $40,000 for the *Dollar Sign*; and

- Victim 3: $145,000 for the amount paid for fraudulent *Shadows* Paintings.

Of course, the Court is not bound by the parties' determination of loss. The loss amount for Victim 1 is reasonable as the intended loss, which is appropriate because the defendant

---

[8] Probation added $23,000 for Victim 4, which the parties did not include and which does not result in additional offense levels.

returned $30,000 only after Victim 1 realized that he was defrauded. USSG § 2B1.1, comment. n. 3(E)(i)(I). For Victim 3, $145,000 is the actual loss.

The loss amount for Victim 2 represents the fair market value of the artwork, which is a reasonable method of determining loss. USSG § 2B1.1, comment. n. 3(C)(1)(i). In fact, this was the amount paid by the family of Victim 2 when the artwork was purchased. PSR ¶ 26. Moreover, the government retained an expert, Sharon Crust, a professional appraiser of Post-War Contemporary and Emerging Art and a certified member in the Appraisers Association of America. Ms. Crust opined that the fair market value of the artwork in 2011 was $240,000. See Fair Market Value Appraisal Report for Legal Proceedings in *United States v. Brian Walshe*, attached at Ex. 1. She based this estimate on factors including the contemporary art market, including turnover of art and the price growth for contemporary art, the Andy Warhol Art Market in general, and the Shadow Paintings Art Market. As Ms. Crust demonstrates, this estimate is a fair one, which the Court should adopt.

### B.  Guidelines Sentencing Range

The PSR found, and the parties concur with, the following guidelines analysis: the defendant's base offense level is 7 for wire fraud (a felony carrying a sentence up to twenty years) and he receives an additional 12 levels for the loss amount. PSR ¶¶ 53-54. The defendant receives an additional two levels because a substantial part of the fraud scheme was committed outside the United States, specifically France and South Korea, pursuant to USSG § 2B1.1(b)(1)(B); and an additional one level because he was convicted under 18 U.S.C. § 1957, pursuant to USSG § 2S1.1(b)(12)(A). PSR ¶¶ 55-56. Accordingly, the adjusted offense level is 22. PSR ¶ 61.

WALSHE has a single criminal history point for a 2013 CWOF for larceny over $250. According to the PSR, at age 38, WALSHE deposited $32,512 in bad checks into his checking account. PSR ¶ 68.

WALSHE qualifies for a three level reduction for acceptance of responsibility. PSR ¶¶ 63-64. At total offense level 19, CHC I, WALSHE's advisory sentencing guidelines range is 30 to 37 months. PSR ¶ 100.

### III. 18 U.S.C. §3553(a) FACTORS

Consideration of the §3553(a) factors demonstrates that a sentence of 30 months' imprisonment, as well as supervised release, forfeiture, and restitution, constitute a fair and reasonable sentence for the defendant.

#### A. The Nature of the Offense

*The Crime*

Several characteristics of this case demonstrate that this crime was dangerous, bold and harmful. First, WALSHE started his fraud by betraying a friend, Victim 2. As a result, he destroyed that friendship and harmed his relationship within their larger circle of friends. Perhaps their mutual friend put it best: "I am beginning to wonder what [Victim 2] really meant to you. I don't see any good reason why you have set aside finding out what he's going through. What's more important than this?". PSR ¶ 35.

Second, the crime was devious, complicated and planned. WALSHE committed this crime over many years, from 2011 through 2016. He traveled to multiple countries. He enlisted multiple artists to prepare fake paintings, with multiple lies. He involved private galleries, auction houses and even eBay in his scheme. He manipulated and stole from people who trusted him, welcomed him into their homes, and considered him a close friend. He crafted complicated

stories and lies about the paintings to make the fraudulent sales believable.  WALSHE proved so successful, in fact, that the FBI has not yet recovered the artwork despite an investigation of several years and the defendant's guilty pleas.[9]

Third, over the course of nearly six years, he targeted and ensnared several victims, which included a Warhol dealer, an art consultant, and his own dentist, for nearly half a million dollars.

In the government's view, in addition to these facts, the *object* of the fraud distinguishes this case from the typical fraud case: pieces of fine art.  While WALSHE sought to defraud others of money, he did so by offering fake artwork, which fundamentally changed the harmfulness of this crime.

Artwork is different.  It is the opposite of fungible—it is unique.  While some people buy art as an investment, it is valuable because it inspires, elevates, challenges, and teaches.  "The encounter with art – and with others over art – can help us identify with one another, expand our notions of *we*, and show us that individual engagement in the world has actual consequences."  Olafur Eliasson (Artist, Studio Olafur Eliasson GmbH), at https://www.weforum.org/agenda/2016/01/why-art-has-the-power-to-change-the-world/.  "The purpose of art is washing the dust of daily life off our souls."  Pablo Picasso, at https://www.pablopicasso.org/quotes.jsp.  Art is innovative and captures a piece of history and culture that future generations can appreciate and learn from.  Perhaps Warhol himself put it best: "Art is what you can get away with."  WALSHE preyed on those sensibilities when he repeatedly offered Warhol's paintings for sale and defrauded those who wanted to own pieces of artwork by a world-famous artist.

---

[9] The FBI continues its investigation to this day.

11

Great works of art are irreplaceable, which heightens the need to protect and care for those pieces. Instead, WALSHE's fraud removes these pieces from public consumption. While they were held privately, they could have rejoined the stream of commerce, eventually ending up in a museum. *See* https://www.npr.org/templates/story/story.php?storyId=122619567 ("American museums owe the vast majority of their art collections to gifts from private collectors.") Alternatively, they could have been loaned to galleries or museums for exhibits, which is also common. *See* http://www.tfaoi.com/aa/7aa/7aa993.htm. In fact, that very thing has happened with other parts of the *Shadows* collection painted by Warhol, which were displayed as recently as January 2020 at the Dia Beacon museum in New York. *See* https://www.diaart.org/exhibition/exhibitions-projects/andy-warholshadows-exhibition. As a result of this fraud, the *Shadows* that were used by Walshe to further his greed will likely never grace the wall of a gallery or museum again and never be encountered by a student, teacher or art lover.

Finally, art fraud by its nature is hard to detect. The work of most artists is not authenticated by unique numbers, such as those used by the Warhol Foundation. The government retained an expert here, Jennifer Mass, Ph.D, of Scientific Analysis of Fine Art, LLC, who opined that the *Shadows* Paintings received by Victim 1 were fakes. *See* Scientific Analysis of Fine Art Report 2015, attached at Ex. 2. Dr. Mass's work here demonstrates the burden and challenges in proving art fraud. Dr. Mass employed photodocumentation, x-ray fluorescence, polarized light microscopy, Fourier transform infrared spectroscopy, and Micro-Raman spectroscopy. She concluded that the method of stretching, canvas, pigment binder and filler, some of the paints, the screen ink, and methods of application were all inconsistent with actual Warhol paintings. While the government removed all doubt regarding this art fraud, its

success here does not change the fact that the defendant's chosen crime is hard to detect and prove and therefore more dangerous. The sentence here should reflect that fact. A slap on the wrist for a fraud that is very difficult to detect but can result in significant riches would not be sufficient deterrent to other fraudsters and would not further the purposes of sentencing as outlined in 18 U.S.C. § 3553(a).

In general, in fraud cases, the guidelines use financial loss as a proxy for harmfulness. As the argument above demonstrates, that proxy simply does not adequately measure the harm in this case of art fraud and the Court should consider both the dangerousness and the entire loss to the victims and community. *See United States v. Medford*, 194 F.3d 419, 422 (3d Cir. 1999) (Alito, J.) (in theft of cultural items case under 18 U.S.C. § 668, court remanded the sentence after the district court upwardly departed without providing notice but affirmed that departure because the monetary loss did not fully capture the harmfulness of the crime, particularly to culture and society). While the government does *not* seek an upward departure, it submits that a low end sentence is necessary to punish adequately the harm here.

*The Victims*

Victims 1, 2 and 3, who reside respectively in California, South Korea, and France, decline their opportunity to appear at the sentencing hearing and address the Court. Nevertheless, Victims 1 and 3 submitted letters for the Court's consideration, which further illustrate the nature of this fraud and speak to another, human side of the harmfulness of this crime.

First, Victim 1 highlights just how successful a fraudster WALSHE was. Victim 1 makes his living by his Warhol dealership. Despite having made hundreds of purchases over ten years, in similar circumstances, only WALSHE successfully "conned" Victim 1. Victim 1 also

highlighted the skills and parts of his background that WALSHE manipulated: strong communication skills, likability, his generational wealth, including the address of a multi-million dollar home.  WALSHE retains these attributes (and thus remains a danger of future fraud).  *See* Ex. 3 (Letter of Victim 1).

Second, Victim 3, who also did his due diligence, demonstrates the full extent of the harmfulness of this fraud crime.  Victim 3 advised his father to purchase the *Shadows* Paintings with his father's life savings, as a retirement investment vehicle.  Instead of a stable, strong investment, his 63 year old father has had to put off his retirement for another ten years.  Victim 3 has struggled to repay his father, which may take him over a decade.  And, perhaps most significantly, they have become estranged: his father resents him and does not talk to him anymore.  Even payment of restitution is unlikely to heal those scars.  *See* Ex. 4 (Letter of Victim 3).

      **B.**    **Characteristics of the Defendant**

Unlike many defendants who come before this Court, WALSHE has enjoyed many benefits in life.  He comes from a wealthy family, he graduated from boarding school, and he had opportunities to attend excellent universities: Carnegie Mellon University, University of Massachusetts in Amherst, Northeastern University, and the JFK School of Government at Harvard University.  PSR ¶¶ 76, 90.  He has had employment opportunities, with his own consulting firm, as a real estate agent, and even as a representative of a Spanish wine company.  PSR ¶¶ 91, 94.  Nevertheless, WALSHE orchestrated a long, complicated fraud over many years of this period.  In fact, he took advantage of these very traits to ensnare his victims. Both victims noted the skills that WALSHE used to "con" them: his likability, communication, his reassurance.  There is no excuse for his failure to use these skills for legitimate employment.

In fact, this fraud – or frauds, really, because WALSHE repeatedly sold the fake *Shadows* Paintings and at least twice sold the *Dollar Sign* – was not an isolated incident. Other friends reported to the FBI that WALSHE stole from them. For example, a college friend (not Victim 2) reported that WALSHE "borrowed" $500,000 and never repaid it.[10] Another friend told the FBI that WALSHE would attend elaborate, expensive dinners and ask his friends to pay for them. This friend also reported that he provided WALSHE an email account from his company; WALSHE told someone that WALSHE was the CEO, whose mother contacted the company; and he (the friend) was called into the actual CEO's office to explain why his friend (WALSHE) was claiming to be the CEO when he didn't even work for the company. Even the previous owner of WALSHE's former condominium in Lynn reported to the FBI that WALSHE did not forward to the seller a check made out to the seller, which likely arrived at the condominium; instead, WALSHE cashed it and kept the money. And as shown by WALSHE's criminal history, *see* PSR ¶ 68, he has a prior court case for depositing over $30,000 in bad checks, whose resolution by CWOF did not deter WALSHE from continuing to engage in fraud.

What happened to the money WALSHE took from the victims in this case helps explain the real reason WALSHE committed these frauds: to sustain his lavish lifestyle using unlawful means. For example, after obtaining $145,000 from Victim 3 in France, WALSHE's credit card receipts show that he and his wife went shopping at Prada. Similarly, the money that WALSHE obtained from Victim 1 mostly went to pay credit card debt, which included charges for travel and restaurants.

---

[10] In a search of WALSHE's house, the FBI recovered a "Financial Obligation Contract" obligating WALSHE to repay this friend and demand letters to WALSHE from attorneys representing the friend.

WALSHE still enjoys many benefits: he has a family which has stood by him; he has the support of his mother; he now appears to have a job; and he has a home less than a mile from the beach in Cohasset.[11] Those assets would ease his return to society from a term of imprisonment. WALSHE's positive situation, furthermore, stands in stark contrast to that of Victim 3, who is now estranged from his father and working to restore to his father the money stolen by WALSHE so that his father can retire.

Finally, although the government asknowledges WALSHE's efforts at rehabilitation, *see* PSR ¶ 86, the government would like to see WALSHE direct his efforts at making the victims whole, including by return of Victim 2's artwork.

### C. Specific and General Deterrance

As for specific deterrence, WALSHE likely believes that he is already rehabilitated. PSR ¶ 86. The government hopes that is the case but notes that many of WALSHE's circumstances remain the same as the circumstances present when he committed his multi-year fraud: same family situation, working for mostly for himself, and uncertain finances. Most significantly, WALSHE has not returned the *Shadows* Paintings (or, if he is not in a position to return the paintings, told the FBI what he did with the paintings). Given Walshe's lengthy history of defrauding multiple individuals, the need for specific deterrence remains.

As for general deterrence, fraud cases such as this one present a significant need for general deterrence, because the argument of many fraudsters is that they will not get in trouble a second time. Of course, that argument emphasizes the need for certain punishment for the first

---

[11] The website Zillow, consulted on September 9, 2021, says that the house was last sold on November 6, 2020, for $800,000 and estimates that it is now worth $882,600. The government omits the website citation because it contains the defendant's address, which should not be available online, but notes that it is the address on page 3 of the PSR.

fraud, to discourage any potential fraudsters from engaging in the criminal conduct in the first place. This is especially true when the fraud at issue deals with a sophisticated fraud that is hard to detect, and involves artwork from one of the most iconic artists in history, all of which further alters the cost-benefit analysis that a potential fraudster may engage in. Put differently, there are many people in our society—fraudsters and otherwise—who would be anything but discouraged from committing a crime if the benefit was hundreds of thousands of dollars in ill-gotten gains and/or the chance to retain world-famous artwork, the risk was a low probability of being caught given the complex nature of the crime and the subject matter of the offense, and the cost of getting caught was a minimal jail sentence even if the multi-year crime spree resulted in a multi-year FBI investigation and a multi-count federal conviction. That should not be the message sent by the sentence imposed by this Court.

### D. Conditions of Supervised Release, Fine, Restitution and Forfeiture

*Supervised Release*

In addition to the period of incarceration, the government seeks a term of 36 months of supervised release, with the mandatory and standard conditions set forth on pages 31-32 of the PSR. The government highlights the following standard conditions: 1, which would require WALSHE to pay any fine or restitution imposed; 2, a prohibition on new credit without the approval of the Probation Office; and 3, which would permit the Probation Office access to financial information. These conditions would assist WALSHE in making restitution, a necessary condition of his rehabilitation. In addition, the government requests as a standard condition that WALSHE seek and maintain regular employment. While WALSHE has skills and has had opportunities in the past, he has squandered them. The Probation Office's guidance and direction in this area would benefit WALSHE and keep him on course.

*Restitution*

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A. The government seeks orders of restitution for Victims 1, 2, and 3, as set forth in the Plea Agreement and ¶ 112 of the PSR. The parties agreed that the last third-party sale would determine the value for restitution. The government also agreed that, should the defendant or a third party return the *Shadows* Paintings no later than 24 hours prior to sentencing, it would ask the Court to delay entry of restitution and would request an amount of restitution consistent with the return of the paintings and 18 U.S.C. § 3663A(b).[12]

*Forfeiture and Fine*

The government also seeks orders of forfeiture: a money judgment for $225,000 ($80,000 defrauded from Victim 1 and $145,000 defrauded from Victim 3) and for the *Shadow* Paintings. Under the Plea Agreement, § 5, the government agreed to submit a restoration request to the Department of Justice, pursuant to 28 C.F.R. Part 9. Restoration would allow money paid toward the forfeiture money judgment to be credited toward restitution (and thereby save WALSHE from having to "pay twice").

Nevertheless, the government does not seek a fine because, consistent with the parties' plea agreement, it is seeking orders of restitution and forfeiture and a forfeiture money judgment. Those orders will make the victims whole before the government. Furthermore, the government seeks a term of imprisonment, which is necessary and appropriate to punish WALSHE, as discussed above. The government requests imprisonment with the understanding that such imprisonment might delay WALSHE's efforts at repayment (as the defendant will likely note).

---

[12] This procedure would allow the government to seek an order of restitution, but in an amount less than $240,000, if the paintings are returned in a lesser condition, for example.

However, as of the date of the filing, WALSHE has not returned any artwork or made any payments toward restitution, which he could have done. Under these circumstances, the government seeks to prioritize imprisonment and the payment of those orders instead of a fine.

## IV. THE GOVERNMENT'S RECOMMENDATION

For the foregoing reasons, those contained in the PSR and those to be presented at the sentencing hearing, the government requests the following sentence for each defendant:

- 30 months' imprisonment;
- no fine;
- a term of 36 months' supervised release with the conditions discussed above;
- restitution as discussed above;
- entry of the Orders of Forfeiture [Dkt. Nos. 97.1 and 97.2]; and
- a special assessment of $300.

Respectfully submitted,

NATHANIEL R. MENDELL
ACTING UNITED STATES ATTORNEY

By: s/ Timothy E. Moran
TIMOTHY E. MORAN
KUNAL PASRICHA
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                     s/ Timothy E. Moran
                                                   TIMOTHY E. MORAN

Date: September 10, 2021